IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF IOWA

In the Matter of:                                   Case No. **12-03377-lmj13**

**Larry C. West**,

         Debtor

**MEMORANDUM OF DECISION**
**(date entered on docket: April 11, 2014)**

Chapter 13 Debtor Larry C. West ("Debtor") contends that Creditor First Class Credit Union ("FCCU") violated the 11 U.S.C. section 362(a) automatic stay by allowing an automatic payment withdrawal from his account for a car loan that would be paid through the plan, by sending a late notice for the same loan, by suspending his debit card privileges and those of his non-filing spouse on their joint checking account, by FCCU personnel asking certain questions of him during a phone call and during visits to a branch office, by FCCU personnel asking certain questions of his non-filing spouse during her visits to that branch office, and by the manner in which it updated his payment history on Equifax, Experian, and TransUnion.  Pursuant to 11 U.S.C. section 362(k)(1), he seeks no less than $5,000.00 in actual damages (for psychological and financial injury), no less than $5,000.00 in punitive damages, and $8,155.00 in attorneys' fees (consisting of $5,905.00 for services rendered and costs incurred from December 28, 2012 through March 1, 2013, the date of the evidentiary hearing, and $2,250.00 for time spent preparing a posthearing brief).  Having reviewed the record and the written arguments of the parties, the Court enters its decision finding that Debtor is entitled to nothing in actual damages, nothing in punitive damages and nothing in attorneys' fees.

The Court has jurisdiction of this matter pursuant to 28 U.S.C. section 1334 and the standing order of reference entered by the United States District Court for the Southern District of Iowa. This is a core matter under 28 U.S.C. section 157(b)(1).

BACKGROUND

On October 29, 2012 Debtor filed his petition for relief under Chapter 13 of Title 11 of the United States Code. On Schedule B (Personal Property) he listed one checking account and three savings accounts with FCCU at paragraph one and a 2004 Saturn Vue worth $7,075.00 at paragraph 25. He indicated the checking account and the vehicle were jointly owned. On Schedule D (Creditors Holding Secured Claims), he included a $9,323.00 debt owed to FCCU that was secured by the vehicle. He indicated there was a codebtor on the account. On Schedule F (Creditors Holding Unsecured Nonpriority Claims), he included a $1,889.00 line of credit debt owed to FCCU. He did not indicate there was a codebtor. On Schedule H (Codebtors), he listed Haroldine West, his non-filing spouse, as a codebtor with respect to FCCU. (Though the scheduled information taken as a whole would suggest that the non-filing spouse was a codebtor with respect to the secured debt and not with respect to the unsecured debt, her testimony and credit reports that Debtor offered and the Court admitted into evidence indicated that she was a codebtor on the unsecured debt but not on the secured debt.) The Clerk of Court provided notice of the bankruptcy filing to FCCU.

On October 29, 2013 Debtor also filed his Chapter 13 plan. It provided for payment of FCCU's scheduled secured debt through the plan rather than directly by him. Accordingly, Debtor did not include the monthly payment on Schedule J (Current Expenditures of Individual Debtor(s)). The plan also provided for a 33% distribution on

unsecured nonpriority claims. Debtor's attorneys served the plan on parties in interest, including FCCU.

On November 6, 2012 Becky Peterson ("Peterson"), FCCU's collections and loan officer responsible for adding bankruptcy information to member accounts, inserted "Haroldine-Goes By Dena Ch. 13 Bk Filed 10-29-12" in a yellow flagged message box on Debtor's member information screen and "FILED CH. 13 BANKRUTPCY [sic], SENT OUT POC ON 11-6-12 CLOSED LINE OF CREDIT SENT OUT ADVERSE ACTION [NOTICE]" in the "Notes, Warnings and Alerts" section of the same screen. (Neither Debtor's attorneys nor FCCU's attorney asked Peterson what she had entered on the non-filing spouse's member information screen.)

On November 20, 2012 the monthly $246.00 payment on Debtor's car loan was withdrawn automatically from the joint checking account. Peterson testified this was caused by her failure to turn off the automatic payment withdrawal feature when she initially entered the bankruptcy information. Upon questioning by one of Debtor's attorneys, she agreed it was FCCU's policy to stop the automatic payment withdrawal feature when a member files a bankruptcy petition—even though the written procedures reviewed on the record were silent about that step. (Neither Debtor's attorneys nor FCCU's attorney asked Peterson how she had interpreted the plan provision regarding the auto loan. They did not ask her if it was FCCU's policy to stop automatic payment withdrawals even when a plan provides that a debtor will continue to make payments directly to FCCU—without first contacting the debtor's attorney to determine if the debtor would prefer that the automatic payment withdrawal continue.)

Debtor noticed the automatic payment withdrawal sometime in December 2012. He testified he was a little bit irritated by the matter and contacted his attorneys. They advised him to call FCCU and provided him with a tape recorder to record the conversation.

When Debtor called FCCU about the automatic payment withdrawal, he spoke with Travis DeRidder ("DeRidder"), a loan officer and assistant branch manager for FCCU, who saw the bankruptcy information that appeared on Debtor's member information screen but questioned whether Debtor would be required to cancel the automatic payment withdrawal because it was the Debtor who had requested that payment arrangement originally. Accordingly DeRidder put Debtor on hold while he conferred with the collections department. Peterson authorized the reversal of the payment, and DeRidder put the amount that had been automatically withdrawn back into the joint checking account. DeRidder testified that Peterson asked him to inquire whether Debtor planned on surrendering the vehicle or keeping it. Debtor responded that he planned on keeping the vehicle but paying the loan through his Chapter 13 plan. DeRidder canceled the automatic payment feature based on Debtor's verbal authorization.

During the morning of December 24, 2012, Debtor and his non-filing spouse went to a FCCU branch office to obtain a cashier's check for a payment to the Chapter 13 trustee. Upon seeing a red-flagged delinquency alert on a multi-transaction screen for Debtor's account but overlooking the yellow–flagged warning about the bankruptcy filing, Kandace Hanson ("Hanson"), a teller for FCCU, advised Debtor that he had a delinquent loan and asked him when he would be making a payment on it. Upon being

advised by Debtor about his bankruptcy case, Hanson realized she had overlooked the bankruptcy warning, apologized for her error and completed the requested transaction.

Debtor testified that he was embarrassed and uncomfortable when Hanson asked him for a payment in front of another customer who was a teller window away—even though he did not know if that person heard the conversation. Debtor stated that he has conducted many subsequent similar transactions at FCCU without incident. (Debtor also testified that his non-filing spouse was embarrassed and disgusted by the incident; however, neither his attorneys nor FCCU's attorney questioned her about it.)

Debtor's non-filing spouse testified about two occasions when drive-through tellers told her she was late with a payment and asked her if she wanted to make a payment at that time. In each instance, she replied that her husband's bankruptcy covered the debt and that was the end of the discussion. (It is not clear when these exchanges took place. Presumably, the tellers were looking at the member information screen for the non-filing spouse and referencing the unsecured debt for which she is a codebtor.) Regarding another episode, Debtor's non-filing spouse testified that she would not go back to FCCU alone to obtain a cashier's check for a trustee payment because she had been embarrassed when, after she could not remember the full name of the Chapter 13 trustee and started looking for paperwork with his name on it in her purse, she heard the teller finish her sentence with "Albert C. Warford. I know who he is. We get this request a lot." (Tr. 67, ll. 19-20.)

At some point Debtor received a notice from FCCU that was dated December 25, 2012 and that indicated he was past due on the auto loan as of December 20, 2012 in the amount of $246.00. Peterson testified that, contrary to FCCU's written procedures,

she had overlooked putting a hold on the production of late notices when she entered the bankruptcy information on November 6, 2012.  That is what caused the automatic issuance of the late notice.  Peterson first became aware of her error and then corrected it when she read about the late notice in the pending motion that Debtor's attorneys filed on January 9, 2013.  (Neither Debtor's attorneys nor FCCU's attorney asked the Debtor if the late loan notice had impacted him in any way.)

Around the same time, Debtor attempted to make a purchase at a toy store using his debit card for the joint checking account.  When his card was declined, Debtor did not think the cause was related to his bankruptcy filing because he knew that FCCU was aware of his bankruptcy case by that point in time.  Though he was embarrassed by the incident, he did not contact FCCU about the matter.

On December 27, 2012 Debtor's non-filing spouse attempted to make a purchase at a grocery store using her debit card for the joint checking account.  When her card was declined, she went immediately to the FCCU branch office to discuss the matter in person.  She met with Peterson who thought the problem might be related to FCCU's software and indicated she would check into the matter and call her back.  Peterson did call Debtor's non-filing spouse back later that same day to confirm the problem was caused by the software and to report that she had overridden that feature manually.  Peterson testified that the software vendor subsequently corrected the program problem with a patch.  (Neither Debtor's attorneys nor FCCU's attorneys asked Peterson if the non-filing spouse's debit card had been declined because of nonpayment on the line of credit, because of nonpayment on the car loan, or because of nonpayment on both loans.)

Though she did not blame Debtor entirely for the inconvenience she had experienced, Debtor's non-filing spouse testified that she was angry with him for not taking care of the issue right away. Debtor testified that he remains concerned that his debit card might be declined again—even though he has not experienced any similar problem using his card since Peterson addressed the software issue on December 27, 2012.

On January 16, 2013 the Court conducted a hearing on the Chapter 13 trustee's December 18, 2012 objection to the plan. The trustee wanted verification of the non-filing spouse's income and a step-up in the monthly amount of plan payments after Debtor completed making direct payments to another creditor during the term of the plan. At the time of the hearing, the Chapter 13 trustee's attorney reported that Debtor had provided the requested verification, and one of Debtor's attorneys stated that he would be filing a modified plan to address the step-up issue. Accordingly, the Court directed the Debtor to file a modified plan by January 30, 2013. The Clerk of Court entered a minute order to that effect the following day.

On February 21, 2013 Debtor and his attorneys pulled his credit reports from Equifax, Experian and TransUnion. The reports, that Debtor offered and the Court admitted into evidence, indicated FCCU had continued to report that Debtor was past due on his loan payments and did not mention the bankruptcy filing. DeRidder testified that once a loan officer books a loan, FCCU's automated system takes care of updating the account and reporting the information to credit reporting agencies. Peterson testified that she typically adds information that a member has filed a Chapter 13 case only after the plan is confirmed.

Despite Debtor testifying that he does not make a habit of looking at his credit reports and despite the fact that Debtor's attorneys had blocked out all information regarding Debtor's loans with other creditors on those reports, Debtor stated he believed those other creditors had reported this Chapter 13 case to the credit reporting agencies. He thought FCCU reporting he was past due on his loan payments was affecting his fresh start and his ability to rebuild his credit.

Debtor filed a modified plan on April 26, 2013. He made no change to the treatment of FCCU's secured debt but did increase the distribution on unsecured nonpriority claims to 47%. The Court entered an order confirming the uncontested modified plan on May 28, 2013. (Even though neither the original plan nor the modified plan provided for 100% distribution on unsecured nonpriority debts and the non-filing spouse ceased making payments on the line of credit debt, FCCU has not sought relief from the 11 U.S.C. section 1301 codebtor stay to date.)

## APPLICABLE LAW

Regarding the automatic stay that goes into effect upon the commencement of a bankruptcy case and applies to all entities, 11 U.S.C. section 362(a)(6) identifies "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title" as one of the prohibited acts. Regarding violations of the automatic stay, 11 U.S.C. section 362(k) provides:

> (k)(1) Except as provided in paragraph (2), *an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.*
> (2) If such violation is based on an action taken by an entity in the good faith belief that subsection (h) applies to the debtor, the recovery under paragraph (1) of this subsection against such entity shall be limited to actual damages.

11 U.S.C. § 362(k) (2012) (former 11 U.S.C. § 362(h) (2000) in italics).

In order to recover under the above quoted and italicized language, the United States Court of Appeals for the Eighth Circuit has held that "the party seeking the award must show that he was injured by the violation of the stay and that the violation was willful." Lovett v. Honeywell, 930 F.2d 625, 628 (8th Cir. 1991) (citation omitted). A debtor has the burden of proving that there was a violation, that the violation was willful, and that the debtor suffered an injury as a result. In re Marino, 437 B.R. 676 (B.A.P. 8th Cir. 2010) (citing Lovett, 930 F.2d at 628). The debtor must do so by a preponderance of the evidence. Carter v. First National Bank of Crossett (In re Carter), 502 B.R. 333, 336 (B.A.P. 8th Cir. 2013).

"A willful violation of the automatic stay occurs when the creditor acts deliberately with knowledge of the bankruptcy petition." Knaus v. Concordia Lumber Company, Inc. (In re Knaus), 889 F.2d 773, 775 (8th Cir. 1989) (citation omitted). "[A]n act is deemed to be a willful violation if the violator knew of the automatic stay and intentionally committed the act regardless of whether the violator specifically intended to violate the stay." Carter, 502 B.R. at 336 (quoting Preston v. GMPQ, LLC (In re Preston), 395 B.R. 658, 663 (Bankr. W.D. Mo. 2008)). However, "[c]ourts are unwilling to impose sanctions if the violation is merely technical." Id. at 337 (citing In re Reisen, 2004 WL 764628, at *6 (Bankr. N.D. Iowa Mar. 4, 2004)).

In the Eighth Circuit, recovery of attorneys' fees under section 362(k)(1) is inappropriate in the absence of an award of actual damages. Lovett, 930 F.2d at 629 (holding debtor was not entitled to attorneys' fees because there was insufficient evidence to support an award of actual damages). The appellate court specifically

noted that "[w]e do not believe that the time expended bringing the motion for a temporary restraining order and contempt sanctions, in the absence of any other damage, is the type of damage contemplated by section 362(h)." Id. In the recent decision of Garden v. Central Nebraska Housing Corp., 719 F.3d 899, 906-07 (8th Cir. 2013), the same appellate court has held that Lovett does not bar the recovery of attorneys' fees actually incurred to protect the debtor or property of the estate from a creditor's violations of the automatic stay—as distinguished from attorneys' fees incurred in prosecuting a section 362(k)(1) motion.

As for punitive damages, the Eighth Circuit has interpreted the term "appropriate circumstances" in section 362(k)(1) as requiring "egregious, intentional misconduct on the violator's part." Lovett, 930 F.2d at 628 (quoting United States v. Ketelsen (In re Ketelsen)), 880 F.2d 990, 993 (8th Cir. 1989)); Knaus, 889 F.2d at 776 (also quoting Ketelsen).

DISCUSSION

In his motion for sanctions, Debtor mentioned only the automatic payment withdrawal, the conversation with DeRidder, the exchange with Hanson, and the late loan notice. At the time of the hearing, his theory of recovery seemingly had expanded to include the suspension of his debit card privileges, the manner in which FCCU updated his loan history with credit reporting agencies, and his non-filing spouse's experiences with the drive through tellers, the teller who provided the Chapter 13 trustee's name, and the suspension of her debit card privileges. (In his posthearing brief, Debtor clarified he was not contending the comment about the Chapter 13 trustee was a violation of the automatic stay.)

Preliminarily this Court observes that Debtor's non-filing spouse is not a joint debtor in this case. She is a codebtor. Debtor's attorneys represent the Debtor; they do not represent the non-filing spouse. She has not filed a motion for sanctions for violation of the 11 U.S.C. section 1301 codebtor stay. Even if such a motion were pending and this Court were to assume for the sake of argument that FCCU had willfully violated the codebtor stay, the record would not support a finding that the non-filing spouse suffered actual damages or punitive damages as a result of those violations.

As for the various matters involving the Debtor, this Court will assume for the sake of argument that FCCU willfully violated the automatic stay. However, the record does not support a finding that Debtor suffered any actual damages or punitive damages as a result of those violations.

<u>Actual Damages</u>

Contrary to the allegations of psychological injury in his posthearing brief, Debtor's testimony was limited to comments about being a little irritated by the automatic payment withdrawal, being embarrassed during the exchange with Hanson and when his debit card privileges were suspended, and being disappointed by his non-filing spouse's refusal to obtain cashier's checks for him (as a result of an incident he agrees was not a violation of the automatic stay). Debtor felt he was still being harassed by FCCU (despite no ongoing automatic payment withdrawals, no ongoing questions from tellers about the delinquent loans, and no ongoing late notices) and is a little nervous whenever he uses his debit card (despite no ongoing suspension of debit card privileges). None of this amounts to proof of psychological injury.

Contrary to the allegations of financial injury in his posthearing brief, Debtor did not testify about any specific financial loss—other than incurring attorney fees in pursuing the pending section 362(k)(1) motion against FCCU. Debtor did state that he thought the manner in which FCCU was updating his loan history with credit reporting agencies was impacting his ability to rebuild his credit, but he did not identify any specific instance in which that had occurred. In his posthearing brief, Debtor refers to Peterson admitting that FCCU added a charge of $5.12 for credit life/disability insurance to his account postpetition. Though Peterson seemingly did respond in that fashion on cross-examination, she had stated on direct examination that the insurance coverage feature had been shut off to avoid such a charge occurring. Given that the questioning on cross-examination was extremely limited and did not specifically cross-reference and challenge the earlier testimony and given that Debtor has the burden of proof, this Court is unable to find that Peterson's testimony on cross-examination is more likely correct than her testimony on direct examination. Debtor has failed to prove that he has suffered any financial injury as a result of the violations.

### Punitive Damages

The record does not support a finding that FCCU's actions and inactions amounted to egregious, intentional misconduct. DeRidder was simply responding to Debtor's inquiry about the automatic payment withdrawal and trying to resolve the matter for him. Hanson should not have mentioned the delinquent loan but apologized for her error and did not mention the delinquent loan to Debtor in subsequent transactions. Peterson made mistakes that resulted in the automatic payment withdrawal, the late notice and the suspension of debit card privileges. She corrected

those issues when they were brought to her attention. Her request that DeRidder clarify what was happening with the auto loan suggests that she may have been confused about the plan treatment. It is not evidence of egregious intentional misconduct. Her decision to wait until Debtor's Chapter 13 case was confirmed to report the bankruptcy filing to the three credit reporting agencies may have been misguided. It is not evidence of egregious, intentional misconduct.

## Attorneys' Fees

In his thirty-four page posthearing brief that noticeably does not mention the Lovett and Garden decisions, Debtor alternatively requests this Court award him nominal damages in the absence of proof of actual damages. He contends that would be a vindication of his right to be protected by the automatic stay. Presumably Debtor would also argue that the award of nominal damages would allow this Court to award him attorney fees despite the Lovett and Garden decisions. This Court, however, finds that an award of nominal damages as a substitute for actual damages under section 362(k)(1) and then an award of attorneys' fees for prosecution of the section 362(k)(1) motion (that resulted only in the award of nominal damages) would run afoul of the Lovett and Garden decisions. Accordingly, this Court will not award nominal damages to the Debtor and, in turn, can not award him attorney fees.

## CONCLUSION

WHEREFORE, for the reasons set forth in this Memorandum of Decision, the Court finds that: Debtor has failed to sustain his burden of proving by a preponderance of the evidence that he is entitled to an award of actual damages or punitive damages under 11. U.S.C. section 362(k)(1) and, therefore, Debtor's motion must be denied.

A separate Order shall be entered accordingly.

/s/ Lee M. Jackwig
Lee M. Jackwig
U.S. Bankruptcy Judge

Parties receiving this Order from the Clerk of Court:
Electronic Filers in this Chapter Case